Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAHELEH AZIMA, derivatively on behalf of BEYOND MEAT, INC., <br><br> Plaintiff, <br><br> v. <br><br> ETHAN BROWN, LUBI KUTUA, NANDITA BAKHSHI, SETH GOLDMAN, CHELSEA A. GRAYSON, COLLEEN JAY, C. JAMES KOCH, RAYMOND J. LANE, JOSHUA M. MURRAY, and KATHY N. WALLER, <br><br> Defendants, <br><br> and <br><br> BEYOND MEAT, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **DEMAND FOR JURY TRIAL** <br><br><br><br> <u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u> |

## INTRODUCTION

Plaintiff Maheleh Azima ("Plaintiff"), by Plaintiff's undersigned attorneys,

derivatively and on behalf of nominal defendant Beyond Meat, Inc. ("Beyond Meat" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Ethan Brown ("Brown"), Lubi Kutua ("Kutua"), Nandita Bakhshi ("Bakhshi"), Seth Goldman ("Goldman"), Chelsea A. Grayson ("Grayson"), Colleen Jay ("Jay"), C. James Koch ("Koch"), Raymond J. Lane ("Lane"), Joshua M. Murray ("Murray"), and Kathy N. Waller ("Waller") (collectively, the "Individual Defendants," and together with Beyond Meat, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Beyond Meat, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Brown and Kutua for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Beyond Meat, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from February 27, 2025 to November 11, 2025, both dates inclusive (the "Relevant Period").

2.     Beyond Meat is a Delaware Corporation headquartered in El Segundo, California that is chiefly engaged in the production of plant-based meats. The Company

creates its meat products directly from plants, for the purpose of providing consumers with plant-based foods that provide the same sensory aspects as actual animal meat.

3. Given the nature of the Company's operations, it possesses and leases a number of production, warehousing, and research and development properties throughout the United States as well as abroad.

4. The Company possesses a number of long-lived assets, which include the following categories: property, plant, and equipment ("PP&E"), operating lease right of use ("ROU") assets, and prepaid lease costs. The PP&E category consists of the following types of assets: land, buildings, leasehold improvements, furniture and fixtures, manufacturing equipment, research and development equipment, software and computer equipment, and vehicles.

5. Since the beginning of 2025, the Company has encountered falling demand for its products, coupled with large increases in its losses and debt. As such, the Company's priority has been to record operations with positive earnings before interest, taxes, depreciation and amortization ("EBITDA") by the end of 2026. To this end, on February 26, 2025, Defendant Brown stated during an earnings call with analysts and investors to discuss the Company's financial results for the fourth quarter and full year of 2024 that he "want[ed] everybody entirely focused on that" goal.

6. Throughout the Relevant Period, the Individual Defendants repeatedly emphasized their commitment to achieve a positive EBITDA figure for the Company by year-end 2026. As such, the Individual Defendants consistently and explicitly prioritized reducing operating expenses, expanding the Company's gross margins, and improving broader operational efficiency and optimization, even at the expense of other objectives such as revenue growth.

7. Moreover, the Individual Defendants failed to disclose any actual or potential need for the Company to record substantial asset impairment charges attributable to certain of Beyond Meat's long-lived assets, including its PP&E, operating lease ROU assets, or

prepaid lease costs.

8.      For example, on March 5, 2025, the Company filed its Annual Report on Form 10-K with the SEC to report its financial and operational results for the year ended December 31, 2024 (the "2024 10-K"). The 2024 10-K stated that "***The Company concluded that no long-lived assets were impaired during the fiscal years ended December 31, 2024, 2023, and 2022***."[1]

9.      The truth began to emerge on October 24, 2025, before the market opened, when the Company filed a current report on Form 8-K with the SEC to report its preliminary financial results for the third quarter of 2025 (the "October 24, 2025 Form 8-K). The October 24, 2025 Form 8-K disclosed that the Company expected a material impairment charge pertaining to several of its long-lived assets.

10.     On this news, the price per share of the Company's common stock fell roughly $0.65 per share, or approximately 23.06%, from a price per share of $2.84 at the close of trading on October 23, 2025 to close at approximately $2.19 on October 24, 2025.

11.     The truth continued to emerge on November 3, 2025, before the market opened, when the Company issued a press release announcing that it would delay reporting its financial results for the third quarter of 2025 (the "Q3 2025 Untimely Filing Notice").

12.     On this news, the price per share of the Company's common stock fell roughly $0.27, or approximately 16.01%, from a price per share of roughly $1.66 at the close of trading on November 2, 2025 to close at $1.39 on November 3, 2025.

13.     The truth continued to emerge on November 10, 2025, after the market closed, when the Company issued a press release to announce its financial results for the third quarter of 2025 (the "Q3 2025 Press Release"). The Q3 2025 Press Release reported that the Company's loss from operations for the quarter included "***$77.4 million*** in non-cash impairment charges related to certain of the Company's long-lived assets."

14.     On this news, the price per share of the Company's common stock fell $0.12,

---

[1] Unless otherwise stated, all emphasis is added.

Verified Shareholder Derivative Complaint

or approximately 8.96%, from a price per share of roughly $1.34 at the close of trading on November 10, 2025 to close at $1.22 on November 11, 2025.

15.    The truth fully emerged on November 11, 2025, after the market closed, when the Company hosted an earnings call to discuss its financial results for the third quarter of 2025 with investors and analysts (the "Q3 2025 Earnings Call"). During the Q3 2025 Earnings Call, Defendant Kutua stated, in relevant part, that "[t]he total impairment amount of $77.4 million was . . . allocated to PP&E, operating lease ROU assets.

16.    On this news, the price per share of the Company's common stock fell roughly $0.10, or approximately 8.61%, from a price per share of $1.22 at the close of trading on November 11, 2025 to close at approximately $1.12 on November 12, 2025.

17.    During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Beyond Meat, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) several of the Company's long-term assets possessed a book value that exceeded the fair market value of the assets; (2) as a result of the discrepancy between the book value of the Company's long-term assets and their fair market value, the Company would very likely have to record a significant, non-cash impairment charge; (3) as a result of having to record the impairment charge, the Company would be unable to timely file its periodic filings with the SEC; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

18.    The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

19.    Additionally, in breach of their fiduciary duties, the Individual Defendants

Verified Shareholder Derivative Complaint

caused the Company to fail to maintain adequate internal controls while three of the Individual Defendants engaged in lucrative insider trading, reaping combined personal proceeds of *approximately $243,172*.

20.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

21.    In light of the Individual Defendants' misconduct—which has subjected the Company, its founder and President/Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO")/Treasurer to a federal securities fraud class action pending in the United States District Court for the Central District of California (the "Securities Class Action"), which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

22.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

23.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendants Brown's and Kutua's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

24.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331

Verified Shareholder Derivative Complaint

because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

25.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

26.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

27.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

28.    Plaintiff is a current shareholder of Beyond Meat. Plaintiff has continuously held Beyond Meat common stock at all relevant times.

### Nominal Defendant Beyond Meat

29.    Beyond Meat is a Delaware corporation with principal executive offices at 888 N. Douglas Street, Suite 100, El Segundo, California 90245. Beyond Meat's common stock trades on the Nasdaq Stock Market LLC ("Nasdaq") under the ticker symbol "BYND."

### Defendant Brown

30.    Defendant Brown is the Company's founder and has served as the Company's President and CEO since its inception in 2009. Defendant Brown also served as a Company director from 2009 to October 15, 2025.

Verified Shareholder Derivative Complaint

31.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Brown made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 2/28/2025 | 5,844 | $3.16 | $18,467 |
| 3/3/2025 | 21,013 | $3.08 | $64,720 |
| 3/12/2025 | 439 | $3.33 | $1,462 |
| 5/28/2025 | 1,392 | $3.03 | $4,218 |
| 6/2/2025 | 8,848 | $3.11 | $27,517 |
| 8/28/2025 | 1,975 | $2.54 | $5,017 |
| 9/2/2025 | 12,559 | $2.37 | $29,765 |

Thus, in total, before the fraud was exposed, he sold 52,070 shares of Company common stock on inside information, for which he received approximately $151,165 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

32.     The Schedule 14A the Company filed with the SEC on April 8, 2025 (the "2025 Proxy Statement") stated the following about Defendant Brown:

Ethan Brown is the Founder of Beyond Meat and has served as our President and Chief Executive Officer and as a member of our board of directors since our inception in 2009. He has served as a manager of the Planet Partnership, LLC, our joint venture with PepsiCo, Inc., since January 2021, and served as our Secretary from our inception to September 2018. Mr. Brown began his career with a focus on clean energy and the environment, including serving as an energy analyst for the National Governors' Center for Best Practices. He then joined Ballard Power Systems Inc. (NASDAQ: BLDP), a proton exchange membrane fuel cell company, being promoted from an entry-level manager to reporting directly to the Chief Executive Officer before leaving to found Beyond Meat.

Mr. Brown also created and opened a center for fuel reformation and has held several industry positions, including Vice Chairman of the Board at The

National Hydrogen Association and Secretary of the United States Fuel Cell Council. He is on the board of the American Cancer Society's CEO's Against Cancer (LA Chapter), is a Henry Crown Fellow at the Aspen Institute, was honored as part of The Independent's Climate 100 for 2024, Inc.'s Best Led Companies 2021, The Bloomberg 50 for 2019 and Newsweek's Top Innovators of 2019, and, along with Beyond Meat, is the recipient of the United Nation's highest environmental accolade, Champion of the Earth (2018). Mr. Brown received an MBA degree from Columbia University, an MPP degree with a focus on Environment from the University of Maryland and a BA degree in History and Government from Connecticut College. We believe that Mr. Brown is qualified to serve on our board of directors due to his strategic vision for our company and his expertise in technology and business operations.

**Defendant Kutua**

33.     Defendant Kutua has served as the Company's CFO and Treasurer since October 2022.

34.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Kutua made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 2/28/2025 | 1,515 | $3.16 | $4,787 |
| 3/3/2025 | 10,255 | $3.08 | $31,585 |
| 3/12/2025 | 27 | $3.33 | $90 |
| 3/17/2025 | 15 | $3.52 | $53 |
| 4/14/2025 | 1,205 | $2.70 | $3,254 |
| 5/28/2025 | 65 | $3.03 | $197 |
| 6/2/2025 | 3,543 | $3.11 | $11,019 |
| 6/16/2025 | 15 | $3.30 | $50 |
| 7/14/2025 | 1,205 | $3.46 | $4,169 |
| 8/28/2025 | 65 | $2.54 | $165 |
| 9/2/2025 | 3,544 | $2.37 | $8,399 |

Thus, in total, before the fraud was exposed, he sold 21,454 shares of Company common stock on inside information, for which he received approximately $63,768 in proceeds. His

9

insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

35.    The 2025 Proxy Statement stated the following about Defendant Kutua:

Lubi Kutua has served as the company's Chief Financial Officer and Treasurer since October 2022. Mr. Kutua served as Vice President, FP&A and Investor Relations from January 2019 to October 2022. Before joining Beyond Meat, Mr. Kutua served as Vice President, Equity Research, with a focus on the packaged foods and agribusiness sectors, at Jefferies, LLC from August 2015 to January 2019. Prior to that, Mr. Kutua served as Associate-Analyst, Equity Research, also focusing on packaged foods and agribusiness, at KeyBanc Capital Markets. He began his career in financial services at Goldman Sachs, most recently serving as Associate, Divisional Management Reporting. Mr. Kutua received his BA degree in Mathematics and Physics from Hamilton College, and his MBA degree from The New York University Leonard N. Stern School of Business.

### Defendant Bakhshi

36.    Defendant Bakhshi served as a Company director from May 2024 until she resigned on October 15, 2025. Prior to her resignation, Defendant Bakhshi served as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.

37.    The 2025 Proxy Statement stated the following about Defendant Bakhshi:

Nandita Bakhshi has served as a member of our board of directors since May 2024. Ms. Bakhshi served as Special Advisor to, and a current Board Member of, BMO Financial Corp. since February 2023. Ms. Bakhshi served as President and Chief Executive Officer of Bank of the West and as co-Chief Executive Officer of BNP Paribas USA, Inc. from March 2016 to February 2023. Ms. Bakhshi also served on the board of directors of each of Bank of the West and BNP Paribas USA, Inc. from March 2017 to February 2023, during which she served on each of their Risk Committees and Compensation/HR Committees. Ms. Bakhshi was Head of US Consumer Bank and Group Head of Direct Channels at TD Bank from March 2009 to February 2016, Head of Products and Payments at Washington Mutual from

March 2006 to September 2008, and Head of Mobile Commerce at First Data from March 2004 to March 2005.

Ms. Bakhshi has been a member of the board of directors of Quaker Chemical Corporation, doing business as Quaker Houghton (NYSE: KWR), a global leader in industrial process fluids, since July 2024 and currently serves on its Audit Committee and Sustainability Committee. Ms. Bakhshi has been a member of the board of directors of Grameen America, Inc., a non-profit microfinance institution, since March 2020 and currently serves on its Audit Committee. Ms. Bakhshi served on the board of directors of the Whitaker Peace & Development Initiative from March 2020 to February 2023 and is a Board Member Emeritus of the US-India Strategic Partnership Forum.

Ms. Bakhshi received an MA degree in international relations from Jadavpur University and a BA degree in history from the University of Calcutta. We believe that Ms. Bakhshi is qualified to serve on our board of directors due to her diversified financial industry background and leadership experience.

**Defendant Goldman**

38.    Defendant Goldman has served as a Company director since February 2013 and has served as Chairman of the Board since February 27, 2020. Defendant Goldman previously served as the Company's Executive Chairman of the Board from October 2015 to February 27, 2020. Defendant Goldman also currently serves as a member of the Nominating and Corporate Governance Committee.

39.    The 2025 Proxy Statement stated the following about Defendant Goldman:

Seth Goldman has served as a member of our board of directors since February 2013. Mr. Goldman served as Executive Chair of Beyond Meat from October 2015 through February 2020. Mr. Goldman co-founded Eat the Change, Inc., a plant-based snack food and organic tea company under the brand Just Ice Tea®, and has served as its Chief Executive Officer since March 2020. He is also a Co-Founder of PLNT Management, Inc., which operates PLNT Burger®, a plant-based quick-serve restaurant chain, and has served as its Board Chair since 2021. Mr. Goldman has been the Chair of Mission Guardians for Tony's Chocolonely, a Certified B Corporation and impact company that makes chocolate and fights for equality in the chocolate industry, since that position was established in May 2023. Mr. Goldman has been a member of the Maryland Economic Development Commission since

April 2023. Mr. Goldman was the TeaEO Emeritus and Innovation Catalyst for The Coca-Cola Company's Venturing & Emerging Brands, a part-time position he held from November 2015 through December 2019. Mr. Goldman co-founded Honest Tea Inc., a bottled organic tea company, in February 1998, which was later sold to The Coca-Cola Company, and previously served as Honest Tea's President and TeaEO until 2015.

In 2022, Mr. Goldman was named Person of the Year by BevNet Magazine, and in 2015 he was named the #1 Disruptor by Beverage World and Beverage Executive of the Year by Beverage Industry magazine. He has also been recognized as an Ernst & Young Entrepreneur of the Year and by the Washington Business Hall of Fame. In 2018, Partnership for a Healthier America recognized Mr. Goldman with its Visionary CEO award. Mr. Goldman is a co-Chair of the Yale School of Management's Entrepreneurship Advisory Board and, since January 2008, has served on the board of directors of Bethesda Green, a sustainability non-profit he co-founded in Bethesda, Maryland. He also served on the board of directors of Ripple Foods, a dairy-free plant-based milk company, from November 2015 to October 2020, the advisory board of the American Beverage Association from 2013 to 2019 and the Yale School of Management from July 2013 to March 2020. Mr. Goldman has demonstrated his commitment to boardroom excellence as a Board Leadership Fellow with the National Association of Corporate Directors.

Mr. Goldman received a BA degree in Government from Harvard College and an MPPM degree from Yale School of Management and is a Henry Crown Fellow at the Aspen Institute. We believe that Mr. Goldman is qualified to serve on our board of directors due to his extensive experience working at fast-growing brands in the food and beverage industry, his experience founding and building entrepreneurial companies, and his knowledge of sustainable business practices.

**Defendant Grayson**

40.    Defendant Grayson has served as a Company director since May 2024. Defendant Grayson also currently serves as the Chair of the Risk Committee and as a member of the Nominating and Corporate Governance Committee.

41.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Grayson made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 3/13/2025 | 3,330 | $3.29 | $10,956 |
| 3/25/2025 | 1,110 | $3.28 | $3,641 |
| 4/25/2025 | 1,125 | $2.54 | $2,858 |
| 5/28/2025 | 1,125 | $3.11 | $3,499 |
| 6/25/2025 | 492 | $3.50 | $1,722 |
| 7/25/2025 | 492 | $3.85 | $1,894 |
| 8/26/2025 | 492 | $2.60 | $1,279 |
| 9/25/2025 | 492 | $2.86 | $1,407 |
| 10/27/2025 | 492 | $2.00 | 984 |

Thus, in total, before the fraud was exposed, she sold 9,150 shares of Company common stock on inside information, for which she received approximately $28,239 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

42.    The 2025 Proxy Statement stated the following about Defendant Grayson:

Chelsea A. Grayson has served as a member of our board of directors since May 2024. Ms. Grayson served as an Executive-in-Residence at Wunderkind Corporation (formerly BounceX), a behavioral automation software and analytics company, from March 2020 to January 2024. From November 2022 to July 2023, Ms. Grayson served as CEO of Spark Networks SE (OTC: LOVLY; formerly NASDAQ: LOV), a global dating company with a portfolio of brands (including Zoosk, Elite Singles, Silver Singles, Christian Mingle and JDate/JSwipe), and from August 2020 to July 2023, as a member of its board of directors. From October 2018 to December 2019, Ms. Grayson served as CEO, and from October 2017 to December 2019, as a member of the board of directors, of True Religion, Inc. (formerly NASDAQ: TRLG), a global denim and streetwear company based in Los Angeles. From December 2014 to December 2017, Ms. Grayson was at American Apparel Inc. (formerly NYSE: APP), a global vertically integrated apparel manufacturer, retailer and wholesaler based in Los Angeles, where she first joined as General Counsel, Chief Administrative Officer and Executive Vice President, and then served as CEO and as a member of the board of directors. Prior to American

Apparel, Inc. she was a partner in the M&A/Corporate Governance practice groups at Loeb & Loeb LLP and Jones Day.

Ms. Grayson has been a member of the board of directors of Xponential Fitness, Inc. (NYSE: XPOF), a leading franchisor of boutique fitness and wellness brands (including Rumble, StretchLab, Club Pilates, YogaSix, CycleBar, Pure Barre, AKT, BFT and Lindora) since October 2021, where she currently is the Chair of the Nominating and Corporate Governance Committee and is a member of the Audit Committee and the Human Capital Management Committee. She has also served on the board of directors of Bedrock Manufacturing Company, owner of the Shinola Detroit and Filson brands, since February 2025, and on the board of directors of The Sunrider Corporation, doing business as Sunrider International, a manufacturing, direct selling and retail sales company in the nutraceutical space, since January 2025. Among other past board positions, Ms. Grayson was a member of the board of directors of Goodness Growth Holdings Inc. (CSE: GDNS) from February 2019 to May 2023; Morphe Cosmetics (Forma Brands) from September 2022 to May 2023; iHerb from June 2021 to June 2022; Precision Surfacing Solutions (Lapmaster Group Holdings) from April 2021 to October 2022; LoudPack from December 2020 to March 2022; Sugarfina from January 2019 to December 2020; and Delta Dental from January 2017 to December 2019. Ms. Grayson has been a member of the UCLA Board of Visitors in the English Department since January 2018. Ms. Grayson has demonstrated her commitment to boardroom excellence as a Board Leadership Fellow with the National Association of Corporate Directors. Ms. Grayson's experience at Spark Networks SE, True Religion, Inc. and American Apparel Inc. included executive officer experience prior to or during the time those companies were involved in Chapter 11 bankruptcy reorganization proceedings.

Ms. Grayson received a JD degree, Order of the Coif, from Loyola Law School, and a BA degree in English Literature and Business/Economics from the University of California, Los Angeles. We believe that Ms. Grayson is qualified to serve on our board of directors due to her extensive leadership, corporate governance and public company experience.

**Defendant Jay**

43.     Defendant Jay has served as a Company director since May 2022. Defendant Jay currently serves as the Chair of the Human Capital Management and Compensation Committee and as a member of the Risk Committee.

44.    The 2025 Proxy Statement stated the following about Defendant Jay:

Colleen Jay has served as a member of our board of directors since May 2022. Ms. Jay retired from The Procter & Gamble Company (NYSE: PG) in October 2017 after 32 years of service, most recently as Global Division President from 2015. Ms. Jay joined The Procter & Gamble Company in 1985 where she managed top brand portfolios and large multi-billion-dollar businesses across multiple categories and geographies, including successfully leading a complex transition and divestiture of several businesses and leading operational units in the United States, Canada, China, and multiple global businesses from Switzerland during the course of her extensive career. From 2010 to 2012, Ms. Jay served as President, Global Female Beauty. From 2012 to 2015, Ms. Jay served as President, Global Retail Hair Care and Color.

Ms. Jay has been a member of the board of directors of Treasury Wine Estates Limited (ASX: TWE) since April 2018, and currently serves on its Human Resources Committee and Wine Operations and Sustainability Committee and was previously on its Audit and Risk Committee. Ms. Jay has been a member of the board of directors of The Cooper Companies, Inc. (NASDAQ: COO) since April 2016 and currently serves as Chair of its Organization and Compensation Committee and as a member of its Corporate Governance and Nominating Committee. Ms. Jay has also worked closely with Catalyst, Inc., a non-profit organization dedicated to improving workplace inclusion for women. She received a BBA degree in Business from Wilfrid Laurier University. We believe that Ms. Jay is qualified to serve on our board of directors due to her extensive experience working in the consumer products industry at a leading public company and her experience on other public company boards of directors.

**Defendant Koch**

45.    Defendant Koch has served as a Company director since May 2023 and currently serves as a member of the Risk Committee.

46.    The 2025 Proxy Statement stated the following about Defendant Koch:

C. James Koch has served as a member of our board of directors since May 2023. Mr. Koch founded The Boston Beer Company, Inc. (NYSE: SAM), a producer of alcohol beverages, in 1984, has been its Chairman since 1995 and also served as its Chief Executive Officer until January 2001. Prior to starting

Verified Shareholder Derivative Complaint

The Boston Beer Company, Inc., he worked as a consultant for an international consulting firm with a focus on manufacturing.

Mr. Koch received a BA degree in Government from Harvard College, an MBA degree from Harvard Business School and a JD degree from Harvard Law School. We believe that Mr. Koch is qualified to serve on our board of directors due to his experience founding and building a public craft brewing company, and his skills in strategy, brand development and industry leadership.

**Defendant Lane**

47.     Defendant Lane has served as a Company director since February 2015 and currently serves as a member of the Human Capital Management and Compensation Committee.

48.     The 2025 Proxy Statement stated the following about Defendant Lane:

Raymond J. Lane has served as a member of our board of directors since February 2015. Mr. Lane has been a Managing Partner at GreatPoint Ventures, a venture capital firm, since March 2015. Mr. Lane served as Partner Emeritus and Advisor of Kleiner, Perkins, Caufield & Byers LLC (Kleiner Perkins), a venture capital firm, from April 2013 to December 2019, after having previously served as one of its Managing Partners from September 2000 to November 2014. Mr. Lane has been a member of the board of directors of Hewlett Packard Enterprise Company (NYSE: HPE) since 2015 and currently serves on its Technology Committee and Finance and Investment Committee. In addition, Mr. Lane previously served as executive Chairman of Hewlett-Packard Company from September 2011 to April 2013 and as non-executive Chairman of Hewlett-Packard Company from November 2010 to September 2011.

Prior to joining Kleiner Perkins, Mr. Lane was President and Chief Operating Officer and a director of Oracle Corporation (NYSE: ORCL), a software company. Mr. Lane has served on the Board of Trustees of Carnegie Mellon University, including as Chairman of the Board from July 2009 to July 2015, as an Emeritus Trustee since July 2022, and currently serves on the Executive Committee. He also serves on the board of directors of Special Olympics International. Mr. Lane received a BS degree in Mathematics and an honorary PhD in Science from West Virginia University. We believe that Mr. Lane is qualified to serve on our board of directors due to his experience in working

Verified Shareholder Derivative Complaint

with entrepreneurial companies and his experience on other public company boards of directors.

**Defendant Murray**

49.    Defendant Murray has served as a Company director since May 2024. Defendant Murray currently serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.

50.    The 2025 Proxy Statement stated the following about Defendant Murray:

Joshua M. Murray has served as a member of our board of directors since May 2024. Mr. Murray is currently Chief Financial Officer and Head of Strategy at Orca Biosystems, Inc., a privately held biotechnology company developing allogeneic cell therapies in blood, immune and genetic diseases, and has served in this position since April 2021. Prior to joining Orca Biosystems, Inc., Mr. Murray held various positions at Goldman Sachs & Co. from July 2006 to April 2021, most recently as a Managing Director and Head of West Coast Healthcare Capital Markets, where he advised a wide array of biotechnology and life sciences companies.

Mr. Murray has served as a member of the board of directors of Corcept Therapeutics Incorporated (NASDAQ: CORT), a commercial-stage company engaged in the discovery and development of medications to treat severe endocrinologic, oncologic, metabolic and neurologic disorders by modulating the effects of the hormone cortisol, since June 2021, and currently serves on its Audit Committee.

Mr. Murray received an AB degree, with University Honors, in History and Economics from Harvard College. We believe that Mr. Murray is qualified to serve on our board of directors due to his experience in corporate finance and his experience on another public company board of directors.

**Defendant Waller**

51.    Defendant Waller has served as a Company director since November 2018. Defendant Waller currently serves as the Chair of the Audit Committee and as a member of the Human Capital Management and Compensation Committee. The 2025 Proxy Statement notes that Defendant Waller is the Company's lead independent director.

52.    The 2025 Proxy Statement stated the following about Defendant Waller:

Verified Shareholder Derivative Complaint

Kathy N. Waller has served as a member of our board of directors since November 2018. Ms. Waller retired from The Coca-Cola Company (NYSE: KO) in March 2019 after more than 30 years of service, most recently as Executive Vice President, Chief Financial Officer and President, Enabling Services prior to her retirement. Ms. Waller joined The Coca-Cola Company in 1987 as a senior accountant in the Accounting Research Department and served in a number of accounting and finance roles of increasing responsibility. From July 2004 to August 2009, Ms. Waller served as Chief of Internal Audit. In December 2005, she was elected Vice President of The Coca-Cola Company, and in August 2009, she was elected Controller. In August 2013, she became Vice President, Finance and Controller, assuming additional responsibilities for corporate treasury, corporate tax and finance capabilities, and served in that position until April 2014, when she was appointed Chief Financial Officer and elected Executive Vice President. Ms. Waller assumed expanded responsibility for The Coca-Cola Company's strategic governance areas when she was also appointed to serve as President, Enabling Services, on May 1, 2017.

Ms. Waller has been a member of the board of directors of Delta Air Lines, Inc. (NYSE: DAL) since July 2015, and currently serves as Chair of its Audit Committee and as a member of its Corporate Governance Committee and Personnel & Compensation Committee. Ms. Waller has been a member of the board of directors of CGI Inc. (NYSE: GIB), a leading IT and business consulting services firm, since December 2018 and currently serves as Chair of its Audit and Risk Management Committee. Ms. Waller has also been an executive mentor with the ExCo Group, a global firm of executive mentors, since 2021. Previously she served on the board of directors of Cadence Bank (NYSE: CADE), Coca-Cola FEMSA, S.A.B. de C.V and Monster Beverage Corporation. In addition, she is currently a member of the Board of Trustees of the University of Rochester, Spelman College, the Woodruff Arts Center, where she also serves as Treasurer and Finance Committee Chair, and the Atlanta History Center, and is a Director at Large for the Girl Scouts of Greater Atlanta. In February 2022, Ms. Waller was appointed Executive Director of the Atlanta Committee for Progress, a public/private partnership between the city's top business, civic and academic leaders, and the Mayor of Atlanta. Ms. Waller received a BA degree in History from the University of Rochester and an MBA degree in Accounting and Finance from the Simon Business School at the University of Rochester. We believe that Ms. Waller is qualified to serve on our board of directors due to her more than 30 years of experience in accounting and finance at a major public company and her

experience on other public company boards of directors.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

53.    By reason of their positions as officers, directors, and/or fiduciaries of Beyond Meat and because of their ability to control the business and corporate affairs of Beyond Meat, the Individual Defendants owed Beyond Meat and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Beyond Meat in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Beyond Meat and its shareholders so as to benefit all shareholders equally.

54.    Each director and officer of the Company owes to Beyond Meat and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

55.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Beyond Meat, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

56.    To discharge their duties, the officers and directors of Beyond Meat were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

57.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Beyond Meat, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should

have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

58.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

59.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Beyond Meat were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Beyond Meat's Code of Business Conduct and Ethics (the "Code of Ethics");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Beyond Meat conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Beyond Meat and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Beyond Meat's operations would comply with all applicable laws and Beyond Meat's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

60.    Each of the Individual Defendants further owed to Beyond Meat and its shareholders the duty of loyalty requiring that each favor Beyond Meat's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

61.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Beyond Meat and were at all times acting within the course and scope of such agency.

62.     Because of their advisory, executive, managerial, directorial, and controlling positions with Beyond Meat, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

63.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Beyond Meat.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

64.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

65.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

66.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Beyond Meat was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

67.    Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

68.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Beyond Meat and was at all times acting within the course and scope of such agency.

## BEYOND MEAT'S CODE OF ETHICS

69.    Beyond Meat's Code of Ethics states that it has been adopted "[a]s part of th[e] [Company's] commitment" to "promoting high standards of honest and ethical business conduct and compliance with applicable laws, rules and regulations." The Code of Ethics also states that it "provide[s] guidance applicable to all members of the Company's Board of Directors (the "Board) and officers, employees, independent contractors and consultants of the Company."

70.    In a section titled "Obey the Law," under the subsection "Legal Compliance," the Code of Ethics states the following:

> Directors and employees must follow all applicable laws, rules and regulations of each of the countries where the Company operates while performing their duties to the Company. The Company's success depends upon each employee operating within legal guidelines and cooperating with authorities. It is essential that all employees know and understand the legal

and regulatory requirements that apply to the Company's business and to their specific area of responsibility. While an employee is not expected to have complete mastery of these laws, rules and regulations, employees are expected to be able to recognize situations that require consultation with others to determine the appropriate course of action. If a provision of this Code conflicts with any local law or regulation where an employee is based, the more restrictive requirement applies. See Section 19 (Compliance Standards and Procedures) for a description of whom to contact with questions about legal compliance.

71.    In the section titled "Obey the Law," under the subsection "Insider Trading," the Code of Ethics states the following, in relevant part:

Every director and employee is prohibited from using "inside" or material nonpublic information about the Company, or about companies with which the Company does business, in connection with buying or selling the Company's or such other companies' securities, including "tipping" others who might make an investment decision on the basis of this information. It is illegal, and it is a violation of this Code, the Company's Insider Trading Policy (the "Insider Trading Policy") and other Company policies, to tip or to trade on inside information. Employees who have access to inside information are not permitted to use or share that inside information for stock trading purposes or for any other purpose except to conduct Company business.

Employees must exercise the utmost care when in possession of material nonpublic information. The Insider Trading Policy provides guidance on the types of information that might be nonpublic and material for these purposes, and guidelines on when and how an employee may purchase or sell shares of Company stock or other Company securities.

72.    In a section titled "Ethical Obligations," under the subsection "Conflicts of Interest," the Code of Ethics states the following, in relevant part:

Employees are expected to avoid actual or apparent conflicts of interest between their personal and professional relationships. For directors, this may include recusal from discussions of the Board when their participation could be perceived as creating such a conflict. A "conflict of interest" occurs when a personal interest interferes in any way (or even appears or could reasonably be expected to interfere) with the interests of the Company as a whole.

Verified Shareholder Derivative Complaint

Sometimes conflicts of interest arise when an employee takes some action or has some outside interest, duty, responsibility or obligation that conflicts with an interest of the Company or the employee's duty to the Company. A conflict of interest can arise when an employee takes actions or has interests that may make it difficult to perform the employee's duties objectively and effectively. Conflicts of interest can also arise when an employee or relative of an employee (including a family member of an employee) receives improper personal benefits as a result of the employee's position at the Company. In evaluating whether an actual or contemplated activity may involve a conflict of interest, employees should consider:

•      whether the activity would appear improper to an outsider;

•      whether the activity could interfere with an employee's job performance or morale or that of another Company employee;

•      whether the employee has access to confidential Company information or influence over significant Company resources or decisions;

•      the potential impact of the activity on the Company's business relationships, including relationships with business partners and service providers;

•      the extent to which the activity could benefit the employee or the employee's relatives, directly or indirectly;

•      any overlap between the employee's specific role at the Company; and

•      whether the investment is in a publicly traded or non-publicly traded company.

73.      In the section titled "Ethical Obligations," under the subsection "Financial Integrity; Public Reporting," the Code of Ethics states, in relevant part:

The Company strives to maintain integrity of the Company's records and public disclosure. The Company's corporate and business records, including all supporting entries to the Company's books of account, must be completed honestly, accurately and understandably. The Company's records are important to investors and creditors. They serve as a basis for managing the

Company's business and are important in meeting the Company's obligations to business partners, suppliers, vendors, creditors, employees and others with whom the Company does business. The Company depends on the books, records and accounts accurately and fairly reflecting, in reasonable detail, the Company's assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. To help ensure the integrity of the Company's records and public disclosure, the Company requires that:

• no entry be made in the Company's books and records that is intentionally false or misleading;

• transactions be supported by appropriate documentation;

• the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in the Company's books and records, and agreements may not include "side deals" or other off-the-books arrangements;

• employees comply with the Company's system of internal controls and be held accountable for their entries;

• any off-balance sheet arrangements of the Company are clearly and appropriately disclosed;

• employees work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure documents;

• no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; and

• records be retained or destroyed according to the Company's document retention policies or procedures then in effect.

For clarity, the Company specifically prohibits:

• establishing or using any secret or off-balance sheet function or account for any purpose;

• using corporate funds to establish or use any bank account that is not identified by the name of the owner; and

Verified Shareholder Derivative Complaint

• establishing or using any offshore corporate entity for any purpose other than a legitimate Company business purpose.

74.    In the section titled "Confidentiality," the Code of Ethics states:

In carrying out the Company's business, Covered Parties may learn confidential or proprietary information about the Company, its customers, distributors, suppliers, or joint venture partners. Confidential or proprietary information includes all non-public information relating to the Company, or other companies, that would be harmful to the relevant company or useful or helpful to competitors if disclosed. Covered Parties must maintain the confidentiality of all information entrusted to them, except when disclosure is authorized or legally mandated.

75.    In a section titled "Treat Others Inside and Outside of the Company Fairly and Honestly," under the subsection "Protection and Proper Use of Company Assets," the Code of Ethics states the following, in relevant part:

All employees are expected to protect the Company's assets and ensure their efficient use for legitimate business purposes. These assets include the Company's proprietary information, including intellectual property such as trade secrets, patents, trademarks and copyrights, as well as business and marketing plans and manufacturing ideas, designs, databases, records and any nonpublic financial data or reports. Theft, carelessness and waste have a direct impact on the Company's business and operating results. The Company's physical property, such as computer equipment, buildings, furniture and furnishings, office supplies, products and inventories, should be used only for activities related to an employee's employment, although incidental personal use is permitted. The Company retains the right to access, review, monitor and disclose any information transmitted, received or stored using the Company's electronic equipment, with or without an employee's or third party's knowledge, consent or approval. Unauthorized use or distribution of the Company's proprietary information is prohibited. Any theft, misuse or suspected theft or misuse of the Company's assets that becomes known to an employee must be immediately reported.

76.    In a section titled "Administrative Matters," under the subsection "Amendment and Waiver," the Code of Ethics states:

Any amendment or waiver of this Code must be in writing and must be authorized by a majority of the members of the Board or, to the extent permissible under applicable laws, rules and regulations, a committee of the Board if the Board has delegated such authority to a committee. The Company will notify employees of any material changes to this Code. Any such amendment or waiver may be publicly disclosed if required by applicable laws, rules and regulations.

77.    In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Beyond Meat's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## BEYOND MEAT'S AUDIT COMMITTEE CHARTER

78.    The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee Charter states that the purpose of the Audit Committee is as follows:

The purpose of the Audit Committee (the "Committee") of the board of directors (the "Board") of Beyond Meat, Inc., a Delaware corporation (the "Company"), is to: (A) assist the Board in overseeing (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements, (3) the independent auditor's qualifications and independence, and (4) the performance of the Company's internal audit function and independent auditors; (B) provide such reports as may be required of an audit committee under the rules and regulations promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"); and (C) provide oversight with respect to ethical conduct and any related matters.    The Committee is not responsible, however, for planning or

conducting audits, or determining whether the Company's financial statements are complete and accurate or in accordance with generally accepted accounting principles ("GAAP").

79.    In a section titled "Authority and Responsibilities," the Audit Committee Charter states that the Audit Committee will "[o]n behalf of the Board, oversee the principal financial risk exposures facing the Company and the Company's mitigation efforts in respect of such risks, including, but not limited to financial reporting risks and credit and liquidity risks.

80.    In the same section, the Audit Committee Charter states that the Audit Committee will "[r]eview with management any significant changes to GAAP, SEC and other accounting policies or standards that will impact or could impact the financial reports under review[,]" as well as "[r]eview significant changes to the Company's accounting principles and practices proposed by the independent auditor or management." Moreover, in the same section the Audit Committee Charter states that the Audit Committee will "[r]eview significant changes to the Company's accounting principles and practices proposed by the independent auditor or management."

81.    In the same section, the Audit Committee Charter states that the Audit Committee will:

Recommend to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K based on the Committee's review and discussions (a) with management of the audited financial statements, (b) with the independent auditor of the matters required to be discussed by the PCAOB and the SEC and (c) with the independent auditor concerning the independent auditor's independence.

82.    In the same section, the Audit Committee Charter states that the Audit Committee will "[p]rovide a report in the Company's proxy statement in accordance with the rules and regulations of the SEC[,]" and "[p]eriodically receive reports from management regarding, and review and discuss the adequacy and effectiveness of, the Company's disclosure controls and procedures.

83.    In the same section, the Audit Committee Charter states that the Audit Committee will:

> Review and discuss with the independent auditor, management and internal audit staff or others responsible for the internal audit function (i) their periodic reviews of the adequacy of the Company's accounting and financial reporting processes and systems of internal control, including any significant deficiencies and material weaknesses in their design or operation, and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

84.    In the same section, the Audit Committee Charter states that the Audit Committee will "[r]eview, prior to public release, the substance and presentation of financial information (including any guidance) in the Company's annual and quarterly earnings releases."

85.    In the same section, the Audit Committee Charter states that the Audit Committee will:

> Discuss with management and the independent auditor the quarterly financial statements prior to the filing of the Form 10-Q, including Management's Discussion and Analysis of Financial Condition and Results of Operations contained therein; provided that this responsibility may be delegated to the chairman of the Committee or a member of the Committee who is a financial expert.

86.    In the same section, the Audit Committee Charter states that the Audit Committee will:

> Establish a procedure for receipt, retention and treatment of any complaints received by the Company about its accounting, internal accounting controls or auditing matters and for the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

87.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches

of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

88.    Beyond Meat is a California-based Delaware corporation whose primary operations surround the development and marketing of plant-based meat products.

89.    To accomplish its goals, the Company has established three product platforms to correspond with the global meat market: beef, poultry, and pork. The Company creates its products by using plant-derived amino acids, lipids, carbohydrates, trace minerals, and water to fabricate meat products from the molecular level. The main ingredient the Company uses to fabricate its products is pea protein, made available through a limited number of suppliers. Notably, the Company previously held a multi-year sales agreement with Roquette Frères pertaining to the supply of pea protein, which expired on December 31, 2024.

90.    The Company has also promulgated a brand promise known as "Eat What You Love," which reflects the Company's stated belief that adopting plant-based meats can improve the following issues: climate change, human health, animal welfare, and constraints on natural resources.

91.    The Company states that its products do not include genetically modified organisms, added hormones, or added antibiotics. Moreover, the Company has stated that as of December 2024, all of its retail products in the United States were certified Kosher and Halal.

92.    As of December 2024, the Company's products were available at roughly

129,000 retail and foodservice locations across over 65 countries globally. Moreover, as of December 31, 2024, the Company employed 754 individuals full-time as well as 54 contract workers.

93. As noted above, the Company has faced declining demand for its products since the beginning of 2025. As such, immediately prior to and during the Relevant Period, the Individual Defendants prioritized achieving EBITDA-positive operations by the end of 2026.

94. To accomplish the EBITDA-based goal, the Individual Defendants underlined the importance of reducing operating expenses, improving efficiency, and expanding gross margins. To this end, the Company's Board approved a plan on February 24, 2025 to reduce the Company's workforce in North America and the European Union by roughly 44 employees, or approximately 6% of the Company's total global workforce.

**False and Misleading Statements**

*February 27, 2025 Press Release*

95. The Relevant Period began on February 27, 2025, the day after the Company's issuance of a press release announcing its financial results for the fourth quarter of and year ended 2024 (the "Q4 2024 Press Release"). The Q4 2024 Press Release noted, *inter alia*, the Company decision to institute certain "restructuring initiatives, including a reduction-in-force and suspension of operational activities in China, as it targets EBITDA-positive run-rate by the end of 2026[.]" Moreover, the Q4 2024 Press Release reported roughly $1.5 million to $2.5 million in total one-time cash charges related to the reduction-in-force. The Q4 2024 Press Release also reported that the Company "currently estimates that it will incur one-time non-cash charges of approximately $12.0 million to $17.0 million, primarily related to accelerated depreciation and impairment charges and other write-downs on certain fixed assets in China[,]" "the majority of [which] will be incurred in the first quarter of 2025." Notably, the Q4 2024 Press Release did not identify further anticipated or actual impairment charges pertaining to the Company.

*March 5, 2025 Form 10-K*

96.    On March 5, 2025, the Company filed the 2024 10-K with the SEC. The 2024 10-K was signed by Defendants Brown, Kutua, Bakhshi, Goldman, Grayson, Jay, Koch, Lane, Murray, and Waller. Attached to the 2024 10-K were certifications made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Brown and Kutua certifying that the 2024 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [2024 10-K] fairly presents, in all material respects, the financial condition and results of operations of [the Company]."

97.    The 2024 10-K stated that, as of December 31, 2024, the Company's consolidated long-lived assets, including PP&E and operating lease ROU assets, totaled $308.862 million. Moreover, the 2024 10-K stated the following regarding the impairment of the Company's long-lived assets, in relevant part:

> Long-lived assets are reviewed by management for impairment whenever events or changes in circumstances indicate that the carrying amount of the asset may not be fully recoverable. When events or circumstances indicate that impairment may be present, management evaluates the probability that future undiscounted net cash flows received will be less than the carrying amount of the asset. If projected future undiscounted cash flows are less than the carrying value of an asset, then such assets are written down to their fair values. ***The Company concluded that no long-lived assets were impaired during the fiscal years ended December 31, 2024, 2023 and 2022.***

98.    Notwithstanding the 2024 10-K's statements set forth in the preceding paragraph, the 2024 10-K purported to warn of risks which "may" or "could" result from certain impairment charges pertaining to ROU assets and prepaid lease costs. To this end, 2024 10-K stated the following, in relevant part:

> [W]e ***may*** not be able to build out or occupy the rest of the Campus Headquarters and are considering subleasing, assigning or otherwise transferring the unoccupied space, or negotiating a partial lease termination . . . . An agreement to partially terminate, sublease, assign or otherwise transfer

the unoccupied part of the Campus Headquarters would be subject to certain risks and uncertainties. For example, the agreement ***may*** not be completed on terms advantageous to us because the rental rate we receive under the agreement ***may*** not fully cover the rental rate we pay under the Campus Lease for the same space or our subtenants ***may*** fail to make lease payments, ***which may result in impairment charges for [ROU] assets and prepaid lease costs*** and ***could*** have a negative impact on our financial condition and results of operations. In addition, a partial termination of the lease ***could result in . . . non-cash write-off of prepaid lease costs,*** the amounts of which ***could*** be material and which ***could*** have a negative impact on our financial condition and results of operations.

99.    In addition, the 2024 10-K downplayed the risks that "may" or "could" occur pertaining more generally to potential impairment charges in the future while at the same time emphasizing the Individual Defendants' asset impairment analyses. The 2024 10-K stated the following, in relevant part:

The preparation of financial statements in accordance with GAAP involves making estimates, judgments and assumptions that affect reported amounts of assets (including intangible assets), liabilities, revenues and expenses. This includes estimates, judgments and assumptions for assessing the recoverability of our assets . . . . ***If*** any estimates, judgments or assumptions change in the future, the Company ***may*** be required to record additional expenses and/or impairment charges . . . .

***We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances***, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Our actual results ***may*** differ from these estimates under assumptions or conditions that ***may*** change in the future. While ***we believe the assumptions and estimates we make are reasonable,*** any changes to our assumptions or estimates, or any actual results which differ from our assumptions or estimates, ***could*** have a material adverse effect on our financial position and operating results . . . .

***We perform an asset impairment analysis on an annual basis or whenever events or changes in circumstances indicate that a long-lived asset group may not be recoverable.*** Failure to achieve forecasted operating results, due

to weakness in the economic environment or other factors, changes in market conditions and declines in our market capitalization, the planned suspension of our operational activities in China, and failure to negotiate a partial lease termination or sublease, assign or otherwise transfer the unoccupied space of our Campus Headquarters, among other things, ***could*** result in impairment of our assets and adversely affect our operating results.

### April 8, 2025 Proxy Statement

100. On April 8, 2025, the Company filed the 2025 Proxy Statement with the SEC. Defendants Brown, Bakhski, Goldman, Grayson, Jay, Koch, Lane, Murray, and Waller solicited the 2025 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

101. The 2025 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Brown, Jay, and Lane to the Board until the 2028 Annual Meeting of the Stockholders; (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the year ended December 31, 2025; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

102. Regarding the "Role of the Board in Risk Oversight," the 2025 Proxy Statement stated the following, in relevant part:

> One of the key functions of our board of directors is to oversee our risk management process. The board believes that each director should understand the principal risks associated with the company's business on an ongoing basis and it is the responsibility of management to ensure that the board and its committees are kept well informed of these changing risks on a timely basis. It is important that the board oversees the key risk decisions of management, which includes comprehending the appropriate balance between risks and rewards.
>
> Our board of directors administers this oversight function directly through our board of directors as a whole, as well as through various committees of our board of directors that address the risks inherent in their respective areas of oversight as described below. Risk assessment and risk management are the responsibility of the company's management. While the board provides the

ultimate oversight function over risk assessment and risk management, the
risk committee's responsibility in this regard is, along with the audit
committee, to provide an initial level of oversight and review and to report to
the board of directors on these issues. This risk process includes regular
discussions with management about our major risk exposures, their potential
impact on our business, and management strategies for adequately mitigating
and managing identified risks.

103.    Regarding the Code of Ethics, the 2025 Proxy Statement stated the following:

We maintain a written code of business conduct and ethics that applies to our
directors, officers and employees, including our principal executive officer,
principal financial officer, principal accounting officer or controller, or
persons performing similar functions, contractors and consultants. Our code
of business conduct and ethics is available under the "Investors" section of
our website at https://investors.beyondmeat.com. We intend to disclose future
amendments to our code of business conduct and ethics, or any waivers of its
requirements, applicable to any principal executive officer, principal financial
officer, principal accounting officer or controller, or persons performing
similar functions, or our directors on the same website. We will also provide
a paper copy of our code of business conduct and ethics, free of charge, to any
stockholder upon written request to Beyond Meat, Inc., 888 N. Douglas Street,
Suite 100, El Segundo, California 90245.

104.    The 2025 Proxy Statement was materially false and misleading because it
failed to disclose, *inter alia*, that: (1) several of the Company's long-term assets possessed
a book value that exceeded the fair market value of the assets; (2) as a result of the
discrepancy between the book value of the Company's long-term assets and their fair
market value, the Company would very likely have to record a significant, non-cash
impairment charge; (3) as a result of having to record the impairment charge, the Company
would be unable to timely file its periodic filings with the SEC; and (4) the Company failed
to maintain internal controls. As a result of the foregoing, the Individual Defendants caused
the Company's public statements to be materially false and misleading at all relevant times.

105.    The 2025 Proxy Statement was also materially false and misleading because,
despite assertions to the contrary, the Company's Code of Ethics was not followed, as
evidenced by the Individual Defendants (1) making and/or causing the Company to make

the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Ethics. Further, the 2025 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

106.    As a result of Defendants Brown, Bakhski, Goldman, Grayson, Jay, Koch, Lane, Murray, and Waller causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Brown, Jay, and Lane to the Board until the 2028 Annual Meeting of the Stockholders; (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the year ended December 31, 2025; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

### May 7, 2025 Press Release

107.    On May 7, 2025, the Company issued a press release to announce its financial results for the first quarter of 2025 (the "Q1 2025 Press Release"). The Q1 2025 Press Release stated, *inter alia*, that for the first quarter of 2025, the Company's loss from operations:

> [I]ncluded the following charges recorded in operating expenses: $4.6 million in incremental legal fees associated with arbitration proceedings related to a previously-disclosed contractual dispute with a former co-manufacturer; $1.3 million in non-cash charges arising from specific strategic decisions to increase inventory provision for donation of certain inventory items; and $1.2 million in expenses related to the suspension of operational activities in China.

108.    Notably, the Q1 2025 failed to identify any material impairment charges pertaining to the Company's long-lived assets.

### May 7, 2025 Earnings Call

109.    That same day, the Company hosted an earnings call to discuss its financial results for the first quarter of 2025 with investors and analysts (the "Q1 2025 Earnings Call"). During the Q1 2025 Earnings Call, an analyst made a comment regarding the

Company's one-time charges in the quarter, and asked if the Individual Defendants were aware of "any additional things that are similar to that we should be aware of for the coming couple quarters?" Defendant Brown replied by stating the following, in relevant part:

> *[I]n terms of the sort of one-time items, the only thing that at this point I think that's really worth noting is that China, the costs related to the suspension of our activities in China*, that will, [t]he way we are treating those expenses from an accounting perspective is we are taking accelerated depreciation on those expenses through the end of 2026. *And so each quarter, we will call that out, but each quarter there will be some impact related to that decision.*

**May 8, 2025 Form 10-Q**

110.   On May 8, 2025, the Company filed its Quarterly Report on Form 10-Q with the SEC to report its financial and operational results for the period ended March 29, 2025 (the "Q1 2025 10-Q"). The Q1 2025 10-Q was signed by Defendants Brown and Kutua and contained SOX certifications signed by Defendants Brown and Kutua certifying that the Q1 2025 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [Q1 2025 10-Q] fairly presents, in all material respects, the financial condition and results of operations of [the Company]."

111.   The Q1 2025 10-Q reported that, as of March 29, 2025, the Company's consolidated long-lived assets, including PP&E and operating lease ROU assets, totaled $301.912 million. Additionally, the Q1 2025 10-Q included a boilerplate risk warning section that purported to warn of risks that "may" or "could" result from potential impairment charges in the future. More specifically, the Q1 2025 10-Q stated the following, in relevant part:

> Our substantial investment in manufacturing facilities in China and Europe have exposed and *may* continue to expose us to substantial risks and, as a result, we *may* not realize a return on our investment. For example, although we invested a significant amount to establish local operations in China, in February 2025, we made the decision to suspend our operational activities in China. As such, we have not realized a sufficient return on our investment in

China and expect to incur certain cash and non-cash charges in connection with the suspension of our operational activities in China in the first quarter of 2025. As a result of our decision to suspend our operational activities in China, we currently estimate that we will incur accelerated depreciation and other inventory and asset write-offs in China totaling $13.0 million to $14.0 million through the end of 2026, of which $1.5 million in accelerated depreciation related to the reassessment of useful lives of certain assets was recognized in the first quarter of 2025, and the remainder of which is expected to be evenly distributed beginning in the second quarter of 2025 through the end of the fourth quarter of 2026 . . . .

Unforeseen delays in the suspension of our operational activities in China *may* cause us to incur additional expenses. Operating or otherwise repurposing or disposing of our facilities in China *may* require additional capital expenditures and the efforts and attention of our management team and other personnel, which will divert resources from our existing business or operations. In addition, our manufacturing facility in Enschede, the Netherlands *may* not provide us with all of the operational and financial benefits we expect to receive. These and other risks *may* result in our not realizing a return on, or losing some or all, of our investments in China and Europe, which *could* have a material adverse effect on our financial condition and financial performance.

### *August 6, 2025 Press Release*

112.   On August 6, 2025 the Company issued a press release to announce its financial results for the second quarter of 2025 (the "Q2 2025 Press Release"). The Q2 2025 Press Release noted, *inter alia*, that the Company's loss from operations:

[I]ncluded the following charges recorded in operating expenses: $4.5 million in certain non-routine SG&A [selling, general, and administrative] expenses; $2.5 million in incremental legal expenses associated with arbitration proceedings related to a previously-disclosed contractual dispute with a former co-manufacturer; and $0.5 million in costs related to a partial lease termination of a portion of the Company's campus headquarters building in El Segundo, California[.]

113.   Notably, the Q2 2025 Press Release failed to note any material impairment charge associated with the Company's long-lived assets.

### *August 6, 2025 Earnings Call*

114.   That same day, the Company hosted an earnings call to discuss its financial

results for the second quarter of 2025 with investors and analysts (the "Q2 2025 Earnings Call"). During the Q2 2025 Earnings Call, Defendant Brown discussed the Company's purported focus on optimizing and achieving EBITDA-positive operations, "[m]any of" which he described "as an acceleration of existing priorities" that likely involved and would continue to involve an assessment of the carrying values of such operations. More specifically, Defendant Brown stated, in relevant part:

> To stabilize our business and with a goal to achieve EBITDA positive operations within the second half of 2026 and to realize our much longer-term objective of reshaping global protein markets in support of a healthier and more sustainable future, we are taking significant and immediate actions.
>
> ***Many of these, which I enumerate below, you will recognize as an acceleration of existing priorities.***
>
> One, we are welcoming John Boken of AlixPartners as interim Chief Transformation Officer to lead and support ***our enterprise-wide transformation activities with a focus on operating expense reduction, gross margin expansion and broader operational efficiency***.
>
> Two, ***we are intensifying expense reduction globally to fit our operating base into the existing near-term opportunity***. These measures include a reduction in force that we performed today.
>
>                                     * * *
>
> Three, ***we are deepening each of our gross margin expansion activities, including continuing to optimize our portfolio by*** exiting certain product lines and reconfiguring others, ***making additional investments in our facilities around core production lines and select others where we see opportunities to significantly reduce costs***, working within our supply chain to reduce raw ingredient prices and logistics costs ***and further fitting our production operations to current demand levels*** so as to realize gross margin recovery even under lower volumes.

***August 8, 2025 Form 10-Q***

115.   On August 8, 2025, the Company filed its Quarterly Report on Form 10-Q

Verified Shareholder Derivative Complaint

with the SEC to report its financial and operational results for the period ended June 28, 2025 (the "Q2 2025 10-Q"). The Q2 2025 10-Q was signed by Defendants Brown and Kutua, and contained SOX certifications signed by Defendants Brown and Kutua certifying that the Q2 2025 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [Q2 2025 10-Q] fairly presents, in all material respects, the financial condition and results of operations of [the Company]."

116.   The Q2 2025 10-Q reported that, as of June 28, 2025, the Company's consolidated long-lived assets, including PP&E and operating lease ROU assets, totaled $327.515 million. The Q2 2025 10-Q also purported to warn of risks that "may" or "could" result from the Company's leasing arrangements. More specifically, the Q2 2025 10-Q stated the following, in relevant part:

> Underutilization or cessation of our manufacturing facilities *could* adversely affect our gross margin and other operating results and we *may* be required to . . . write down our long-lived assets, or shorten the useful lives and accelerate depreciation of our assets[.]

> * * *

> We *may* not be able to build out or occupy the rest of the Campus Headquarters and are *considering* subleasing, assigning or otherwise transferring additional unoccupied space, or negotiating further partial lease terminations but *may* be unable to enter into or negotiate such an agreement or partial termination, which *could* have an adverse effect on our operating and financial results. An agreement to partially terminate, sublease, assign or otherwise transfer the unoccupied part of the Campus Headquarters would be subject to certain risks and uncertainties. For example, the agreement *may* not be completed on terms advantageous to us [and] . . . *may* result in impairment charges for [ROU] assets and prepaid lease costs and *could* have a negative impact on our financial condition and results of operations. In addition, a partial termination of the lease *could* result in a penalty payment to exit the lease and non-cash write-off of prepaid lease costs, the amounts of which could be material and which could have a negative impact on our financial condition and results of operations.

117.    The statements in ¶¶95-99, ¶107, ¶¶109-112, and ¶¶114-116 were materially false and misleading at the time they were made because they failed to disclose, *inter alia*, that: (1) several of the Company's long-term assets possessed a book value that exceeded the fair market value of the assets; (2) as a result of the discrepancy between the book value of the Company's long-term assets and their fair market value, the Company would very likely have to record a significant, non-cash impairment charge; (3) as a result of having to record the impairment charge, the Company would be unable to timely file its periodic filings with the SEC; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**The Truth Begins to Emerge as the False and Misleading Statements Continue**

***October 24, 2025 Form 8-K***

118.    The truth began to emerge on October 24, 2025, before the market opened, when the Company filed the October 24, 2025 Form 8-K with the SEC. The October 24, 2025 Form 8-K noted that the Company expected to record a "material," indeterminable non-cash impairment charge pertaining to its long-lived assets. The October 24, 2025 Form 8-K stated the following, in relevant part:

> ***[T]he Company expects to record a non-cash impairment charge for the three months ended September 27, 2025, related to certain of its long-lived assets.*** The Company's recoverability test . . . preliminarily indicated that the carrying amount of certain of its long-lived assets was not recoverable from the projected undiscounted future cash flows of the relevant asset group. ***Although the impairment charge is expected to be material, the Company is not yet able to reasonably quantify the amount at this time.***

119.    The October 24, 2025 Form 8-K generated immediate and significant attention from analysts and other media outlets. For instance, on October 24, 2025, the Wall Street Journal published an article titled "Beyond Meat Expects Impairment Charge, Revenue In Line With Target," which reported that the Company "anticipated a noncash impairment charge tied to some long-lived assets" that "it expects . . . to be material," but

"can't yet quantify the amount."[2] Moreover, that same day the outlet Benzinga published an article titled "Beyond Meat Stock Slips, Traders Chew On Q3 Estimates," which stated, *inter alia*, that the "large non-cash impairment" "mean[s] the book value of some long-term assets (factories, equipment, etc.) is higher than what they're worth and those assets must be 'written down.'"[3]

120. On this news, the price per share of the Company's common stock fell roughly $0.65 per share, or approximately 23.06%, from a closing price of $2.84 per share at the close of trading on October 23, 2025 to close at approximately $2.19 per share on October 24, 2025. However, despite this partial emergence of the truth, the Individual Defendants continued to make false and misleading statements to investors.

### *November 3, 2025 Press Release*

121. On November 3, 2025, before the market opened, the Company issued the Q3 2025 Untimely Filing Notice. The Q3 2025 Untimely Filing Notice noted, with respect to reasons for the delay in filing, that the Company required additional time to complete the impairment review. More specifically, the Q3 2025 Untimely Filing Notice stated the following, in relevant part:

> Beyond Meat . . . is rescheduling the reporting of its financial results for the third quarter ended September 27, 2025 to Tuesday, November 11, 2025 after market close.
>
> As previously disclosed on Form 8-K filed on October 24, 2025, the Company expects to record a non-cash impairment charge for the three months ended September 27, 2025 related to certain of its long-lived assets. Although the Company expects this charge to be material, the Company is not yet able to reasonably quantify the amount, and requires additional time, resources and

---

[2] Robb M. Stewart, *Beyond Meat Expects Impairment Charge, Revenue In Line With Target*, The Wall Street Journal (Oct. 24, 2025, 8:58 AM), https://www.wsj.com/business/retail/beyond-meat-expects-impairment-charge-revenue-in-line-with-target-b484c86f?reflink=desktopwebshare_permalink.
[3] Erica Kollmann, *Beyond Meat Stock Slips, Traders Chew On Q3 Estimates*, Benzinga (Oct. 24, 2025, 12:43 PM), https://www.benzinga.com/trading-ideas/movers/25/10/48411376/beyond-meat-stock-slips-traders-chew-on-q3-estimates.

effort to finalize its assessment, and therefore is rescheduling its previously-announced conference call to Tuesday, November 11, 2025.

122.   Analysts and media outlets were swift to take note of the disclosures in the Q3 2025 Untimely Filing Notice. For instance, that same day, the media outlet Bloomberg Law published an article titled "Beyond Meat Shares Fall as Impairment Charge Delays 3Q Results," which stated that "Beyond Meat shares are down 8.2% in premarket trading after the plant-based protein company postponed the release of its 3Q results to Nov. 11 as it finalizes an assessment of a material non-cash impairment charge tied to certain long-lived assets."[4]

123.   Moreover, the media outlet Reuters also published an article on November 3, 2026 titled "Beyond Meat delays quarterly earnings report to November 11," which reported that Beyond Meat "is delaying its third-quarter results report by a week as it requires more time to quantify an impairment charge related to some of its assets, sending its shares about 12% lower in early trading on Monday."[5]

124.   On this news, the price per share of the Company's common stock fell roughly $0.27, or approximately 16.01%, from a closing price of approximately $1.66 per share at the close of trading on November 2, 2025 to close at $1.39 per share on November 3, 2025.

## THE TRUTH FULLY EMERGES

### *November 10, 2025 Press Release*

125.   The truth continued to emerge on November 10, 2025 when , after the market closed, the Company issued the Q3 2025 Press Release. The Q3 2025 Press Release stated, *inter alia*, that the Company's loss from operations for the quarter "was $112.3 million, or

---

[4] George Azar and Peyton Forte, *Beyond Meat Shares Fall as Impairment Charge Delays 3Q Results*, BLOOMBERG LAW (Nov. 3, 2025, 9:07 AM), https://news.bloomberglaw.com/bankruptcy-law/beyond-meat-delays-3q-results-sees-impairment-charge.

[5] Neil J. Kanatt and Leroy Leo, *Beyond Meat delays quarterly earnings report to November 11*, REUTERS (Nov. 3, 2025, 9:41 AM), https://www.reuters.com/business/beyond-meat-delays-quarterly-earnings-report-november-11-2025-11-03/.

operating margin of -160.0%, compared to loss from operations of $30.9 million, or operating margin of -38.2%, in the year-ago period[,]" which "included ***$77.4 million*** in non-case impairment charges related to certain of the Company's long-lived assets."

126.    On this news, the price per share of the Company's common stock fell $0.12, or approximately 8.96%, from a closing price of approximately $1.34 per share at the close of trading on November 10, 2025 to close at $1.22 per share on November 11, 2025.

### *November 11, 2025 Earnings Call*

127.    The truth fully emerged on November 11, 2025 when, after the market closed, the Company hosted the Q3 2025 Earnings Call. During the Q3 2025 Earnings Call, Defendant Kutua stated, in relevant part, that "[t]he total impairment amount of $77.4 million was . . . allocated to PP&E, operating lease ROU assets and prepaid lease costs on our balance sheet."

128.    On this news, the price per share of the Company's common stock fell roughly $0.10, or approximately 8.61%, from a closing price of $1.22 per share at the close of trading on November 11, 2025 to close at approximately $1.12 per share on November 12, 2025.

### **SUBSEQUENT DEVELOPMENTS**

129.    Analysts and media outlets were once again swift to take notice of the Company's disclosures. For instance, on November 10, 2025, the online publication Stocktwits published an article titled "Is Beyond Meat's 'Meme' Moment Over? Stock Plunges After-Hours As $81M Charge, Shrinking Sales Dent Sentiment," which stated that Beyond Meat's "shares tumbled 9% in after-hours trading on Monday after the company's quarterly report revealed [*inter alia*] . . . [the] significant impairment charge."[6]

---

[6] Yuvraj Malik, *Is Beyond Meat's 'Meme' Moment Over? Stock Plunges After-Hours As $81M Charge, Shrinking Sales Dent Sentiment*, STOCKTWITS (Nov. 10, 2025, 9:24 PM), https://stocktwits.com/news-articles/markets/equity/is-beyond-meat-s-meme-moment-over-stock-plunges-after-hours-as-81-m-charge-shrinking-sales-dent-sentiment/cLPdB25RE2A.

130.   In addition, the online publication The Motley Fool published an article on November 11, 2025, titled "No Bottom in Sight for Beyond Meat's Crashing Sales," which stated, in relevant part, that the "impairment charge of $77.4 million against long-lived assets in the third quarter . . . dragged down the [Company's] bottom line."[7]

## DAMAGES TO BEYOND MEAT

131.   As a direct and proximate result of the Individual Defendants' conduct, Beyond Meat has lost and will continue to lose and expend many millions of dollars.

132.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

133.   Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

134.   Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

135.   Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including lucrative insider trading conducted by three of the Individual Defendants.

136.   As a direct and proximate result of the Individual Defendants' conduct, Beyond Meat has also suffered and will continue to suffer a loss of reputation and goodwill,

---

[7] Timothy Green, *No Bottom in Sight for Beyond Meat's Crashing Sales*, THE MOTLEY FOOL (Nov. 11, 2025, 8:48AM), https://www.fool.com/investing/2025/11/11/no-bottom-in-sight-for-beyond-meats-crashing-sales/.

and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

137.    Plaintiff brings this action derivatively and for the benefit of Beyond Meat to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Beyond Meat, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

138.    Beyond Meat is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

139.    Plaintiff is, and has been at all relevant times, a shareholder of Beyond Meat. Plaintiff will adequately and fairly represent the interests of Beyond Meat in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

140.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

141.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Beyond Meat's Board consisted of the following nine individuals: Defendants Goldman, Grayson, Jay, Koch, Lane, Murray, Waller (the "Director-Defendants") and non-parties Alexandre Zyngier and Raphael Thomas Wallander (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors that were on the Board at the time this action was filed.

142.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company

to make false and misleading statements and omissions of material fact. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

143.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Beyond Meat to issue materially false and misleading statements. Specifically, the Director-Defendants caused Beyond Meat to issue false and misleading statements which were intended to make Beyond Meat appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

144.    Additional reasons that demand on Defendant Goldman is futile follow. Defendant Goldman has served as a Company director since February 2013 and as Chairman of the Board since February 27, 2020. Defendant Goldman previously served as the Company's Executive Chairman of the Board from October 2015 to February 27, 2020. Defendant Goldman also currently serves as a member of the Nominating and Corporate Governance Committee. In addition, Defendant Goldman receives handsome compensation for his role as Chairman of the Board. As the Company's trusted Chairman of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Also, Defendant Goldman signed the materially false and misleading 2024 10-K. Moreover, Defendant Goldman solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Brown, Jay, and Lane to the Board to serve until the 2028 Annual Meeting of the Shareholders. For these reasons, too, Defendant Goldman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus

demand upon him is futile and, therefore, excused.

145. Additional reasons that demand on Defendant Grayson is futile follow. Defendant Grayson has served as a Company director since May 2024. Defendant Grayson also currently serves as the Chair of the Risk Committee and as a member of the Nominating and Corporate Governance Committee. In addition, Defendant Grayson receives handsome compensation from the Company for her role as a director. As a trusted director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Also, Defendant Grayson signed the materially false and misleading 2024 10-K. Moreover, Defendant Grayson solicited the materially false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Brown, Jay, and Lane to the Board to serve until the 2028 Annual Meeting of the Shareholders. Further, her insider sales during the Relevant Period, where she netted proceeds of roughly $28,239, further demonstrate her motive in facilitating and participating in the scheme. For these reasons, too, Defendant Grayson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

146. Additional reasons that demand on Defendant Jay is futile follow. Defendant Jay has served as a Company director since May 2022. Defendant Jay currently serves as the Chair of the Human Capital Management and Compensation Committee and as a member of the Risk Committee. In addition, Defendant Jay receives handsome compensation from the Company for her role as a director. As a trusted director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Also, Defendant Jay signed the materially false and

Verified Shareholder Derivative Complaint

misleading 2024 10-K. Moreover, Defendant Jay solicited the materially false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Brown, Lane, and herself to the Board to serve until the 2028 Annual Meeting of the Shareholders. For these reasons, too, Defendant Jay breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

147. Additional reasons that demand on Defendant Koch is futile follow. Defendant Koch has served as a Company director since May 2023, and currently serves as a member of the Risk Committee. In addition, Defendant Koch receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the schemes to cause the Company to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Also, Defendant Koch signed the materially false and misleading 2024 10-K. Moreover, Defendant Koch solicited the materially false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Brown, Jay, and Lane to the Board to serve until the 2028 Annual Meeting of the Shareholders. For these reasons, too, Defendant Koch breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148. Additional reasons that demand on Defendant Lane is futile follow. Defendant Lane has served as a Company director since February 2015, and currently serves as a member of the Human Capital Management and Compensation Committee. In addition, Defendant Lane receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the schemes to cause the Company to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement

in the schemes, and consciously disregarded his duties to protect corporate assets. Also, Defendant Lane signed the materially false and misleading 2024 10-K. Moreover, Defendant Lane solicited the materially false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Brown, Jay, and himself to the Board to serve until the 2028 Annual Meeting of the Shareholders. For these reasons, too, Defendant Lane breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

149.    Additional reasons that demand on Defendant Murray is futile follow. Defendant Murray has served as a Company director since May 2024. Defendant Murray currently serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. In addition, Defendant Murray receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the schemes to cause the Company to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Also, Defendant Murray signed the materially false and misleading 2024 10-K. Moreover, Defendant Murray solicited the materially false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Brown, Jay, and Lane to the Board to serve until the 2028 Annual Meeting of the Shareholders. For these reasons, too, Defendant Murray breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

150.    Additional reasons that demand on Defendant Waller is futile follow. Defendant Waller has served as a Company director since November 2018. Defendant Waller currently serves as the Chair of the Audit Committee and as a member of the Human Capital Management and Compensation Committee. In addition, Defendant Waller

receives handsome compensation from the Company for her role as a director. As a trusted director, she conducted little, if any, oversight of the schemes to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Also, Defendant Waller signed the materially false and misleading 2024 10-K. Moreover, Defendant Waller solicited the materially false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Brown, Jay, and Lane to the Board to serve until the 2028 Annual Meeting of the Shareholders. For these reasons, too, Defendant Waller breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

151. Additional reasons that demand on the Board is futile follow.

152. Defendants Waller (as Chair) and Murray served as members of the Audit Committee at all relevant times (collectively, the "Audit Committee Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

153. In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to

cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

154.    Beyond Meat has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Beyond Meat any part of the damages Beyond Meat suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

155.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

156.    The acts complained of herein constitute violations of fiduciary duties owed by Beyond Meat's officers and directors, and these acts are incapable of ratification.

157.    The Director-Defendants may also be protected against personal liability for

their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Beyond Meat. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Beyond Meat, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

158.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Beyond Meat to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

159.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### **FIRST CLAIM**
**Against Defendants Brown, Bakhski, Goldman, Grayson, Jay, Koch, Lane, Murray, and Waller for Violations of Section 14(a) of the Exchange Act**

160.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

161.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of

interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

162.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

163.   Under the direction and watch of Defendants Brown, Bakhski, Goldman, Grayson, Jay, Koch, Lane, Murray, and Waller, the 2025 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

164.   The 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) several of the Company's long-term assets possessed a book value that exceeded the fair market value of the assets; (2) as a result of the discrepancy between the book value of the Company's long-term assets and their fair market value, the Company would very likely have to record a significant, non-cash impairment charge; (3) as a result of having to record the impairment charge, the Company would be unable to timely file its periodic filings with the SEC; and (4) the Company failed to maintain internal controls. As a result of the

foregoing, the Individual Defendants' statements were materially false and misleading at all relevant times.

165.    In the exercise of reasonable care, Defendants Brown, Bakhski, Goldman, Grayson, Jay, Koch, Lane, Murray, and Waller, should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2025 Proxy Statement, including, but not limited to, the re-election of directors.

166.    As a result of Defendants Brown, Bakhski, Goldman, Grayson, Jay, Koch, Lane, Murray, and Waller causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Brown, Jay, and Lane to the Board until the 2028 Annual Meeting of the Stockholders; (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the year ended December 31, 2025; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

167.    The Company was damaged as a result of Defendants Brown's, Bakhski's, Goldman's, Grayson's, Jay's, Koch's, Lane's, Murray's, and Waller's material misrepresentations and omissions in the 2025 Proxy Statement.

168.    Plaintiff, on behalf of Beyond Meat, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

169.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

170.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Beyond Meat's business and affairs.

171.    Each of the Individual Defendants violated and breached their fiduciary duties

of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

172.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Beyond Meat.

173.   Also in breach of their fiduciary duties owed to Beyond Meat, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) several of the Company's long-term assets possessed a book value that exceeded the fair market value of the assets; (2) as a result of the discrepancy between the book value of the Company's long-term assets and their fair market value, the Company would very likely have to record a significant, non-cash impairment charge; (3) as a result of having to record the impairment charge, the Company would be unable to timely file its periodic filings with the SEC; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

174.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

175.   Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

176.   In yet further breach of their fiduciary duties, during the Relevant Period, while the Company's common stock was at artificially inflated prices before the fraud was exposed, three of the Individual Defendants engaged in lucrative insider sales, netting combined proceeds of approximately $243,172.

177.   The Individual Defendants had actual or constructive knowledge that the

Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Beyond Meat's securities.

178.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Beyond Meat's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

179.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

180.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Beyond Meat has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

181.   Plaintiff, on behalf of Beyond Meat, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

182.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

183.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Beyond Meat.

184.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Beyond Meat that was tied to the performance or artificially inflated valuation of Beyond Meat, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

185.   Plaintiff, as a shareholder and a representative of Beyond Meat, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

186.   Plaintiff, on behalf of Beyond Meat, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

187.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Beyond Meat, for which they are legally responsible.

189.   As a direct and proximate result of the Individual Defendants' abuse of control, Beyond Meat has sustained significant damages. As a result of the misconduct

alleged herein, the Individual Defendants are liable to the Company.

190.   Plaintiff, on behalf of Beyond Meat, has no adequate remedy at law.

## FIFTH CLAIM
**Against the Individual Defendants for Gross Mismanagement**

191.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

192.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Beyond Meat in a manner consistent with the operations of a publicly held corporation.

193.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Beyond Meat has sustained and will continue to sustain significant damages.

194.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

195.   Plaintiff, on behalf of Beyond Meat, has no adequate remedy at law.

## SIXTH CLAIM
**Against Individual Defendants for Waste of Corporate Assets**

196.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

198.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Beyond Meat to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose

financing from investors and business from future customers who no longer trust the Company and its products.

199.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

200.   Plaintiff, on behalf of Beyond Meat, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Brown and Kutua for Contribution Under Sections 10(b) and 21D of the Exchange Act

201.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

202.   Beyond Meat and Defendants Brown and Kutua are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Brown's and Defendant Kutua's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

203.   Defendants Brown and Kutua because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

204.   Accordingly, Defendants Brown and Kutua are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

205.   As such, Beyond Meat is entitled to receive all appropriate contribution or indemnification from Defendants Brown and Kutua.

Verified Shareholder Derivative Complaint

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Beyond Meat, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Beyond Meat;

(c)    Determining and awarding to Beyond Meat the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Beyond Meat and the Individual Defendants to take all necessary actions to reform and improve Beyond Meat's corporate governance and internal procedures to comply with applicable laws and to protect Beyond Meat and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Beyond Meat to nominate at least five candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Beyond Meat restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including

Verified Shareholder Derivative Complaint

reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: February 12, 2026                    Respectfully submitted,

                                            **THE BROWN LAW FIRM, P.C.**

                                            /s/Robert C. Moest            .
                                            Robert C. Moest, Of Counsel, SBN 62166
                                            2530 Wilshire Boulevard, Second Floor
                                            Santa Monica, CA 90403
                                            Telephone: (310) 915-6628
                                            Facsimile: (310) 915-9897
                                            Email: RMoest@aol.com

                                            *Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Jason Warga, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of January, 2026.

Signed by:

F504B84F25FB4AC...

Jason Warga